# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

GREGORY GALBERTH,

                                 Plaintiff,

      vs.                              9:14-CV-115
                                           (LEK/ATB)

C. DURKIN, et al.,

                                 Defendants.

GREGORY GALBERTH, Plaintiff pro se
JOSHUA E. McMAHON, Asst. Attorney General for Defendants

ANDREW T. BAXTER, United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

This matter has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). In this civil rights complaint, plaintiff alleges that defendants used excessive force on him on three occasions in violation of his Eighth and Fourteenth Amendment rights. (Complaint ("Compl.") (Dkt. No. 1). Plaintiff requests a substantial amount of compensatory and punitive damages. (Compl. at 25).[1]

Presently before the court is the defendants' motion to dismiss the complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiff has filed two responses in opposition to the defendants' motion, and has requested additional time to submit a further response. (Dkt. Nos. 35, 36, 38). For the following reasons, this court

---

[1] Because it is difficult to determine the pagination of the complaint, this court will cite to the page numbers assigned by the court's electronic case filing system (CM/ECF).

will recommend denying the defendants' motion to dismiss, except as it relates to any excessive force claims based upon the Fourteenth Amendment. Because the court is recommending denial of the defendants' motion, it will also deny plaintiff's request to file an additional memorandum in opposition to the motion.

## DISCUSSION

I.   Facts[2]

A.   "First" Incident

Plaintiff alleges that on three different occasions, while plaintiff was incarcerated at Clinton Correctional Facility ("Clinton"), the defendants used excessive force against him. Plaintiff states that he suffers from mental illness and is "in and out" of the "O.B.S. Mental Health Units" ("OBS").[3] (Compl. at 7). He states that the "first incident"[4] occurred on May 15 and 16, 2011, while plaintiff was in an OBS cell. (*Id.* at 8). Plaintiff claims that on May 15th, he complained to defendant Plumbly about the quality and the amount of food that plaintiff was served. (*Id.*) As plaintiff was trying to explain his problem with the food, defendant Plumbly became "hostile," slammed the "feed up hatch," and then called for "a sergeant and another officer." (*Id.* at 9).

---

[2] The court must interpret plaintiff's allegations to raise the strongest arguments that they suggest. *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994) (a court is to read a pro se party's "supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest")). Plaintiff's papers are disjointed, and the court has stated the facts so that they make the most sense.

[3] OBS may refer to an "observation" cell, where plaintiff would be placed for observation when he was having a mental problem.

[4] Although plaintiff refers to the "first incident," it involves two instances in which the defendants used excessive force on him.

Plaintiff states that as the other officers approached plaintiff's cell, defendant Plumbly opened the door of the cell and began to beat plaintiff in the rib cage and lower back. (*Id.*) Officer Plumbly then "body slammed" plaintiff onto the steel bed, got on top of him, and began to choke him, while saying: "I'm tired of your shit." (*Id.* at 9-10). Plaintiff claims that his hands were being held by the "other officers," who were also hitting plaintiff in his right leg. (*Id.* at 10). The sergeant[5] was wearing a ring and hit plaintiff in the face and across the forehead, causing pain. (*Id.*) Plaintiff states that defendant Plumbly continued to choke plaintiff, and then, as plaintiff was turned to face the wall, the officers "took turns" beating him in the head, back, ribs, and right leg. (*Id.*) Plaintiff states that after the officers left his cell, two near-by inmates told plaintiff that they heard "everything," and that plaintiff should call them as witnesses "when the time comes." (*Id.* at 11).

Plaintiff alleges that on May 16th, he reported the May 15th incident to the "medication nurse" and the "medical, med nurse." Plaintiff claims that "she" reported the incident to "A L.T."[6] Plaintiff alleges that he was told by defendant Bisso that he would be taken to the Clinton Facility Clinic. (Compl. at 12). Defendant Bisso allegedly gave orders to defendant Sears and "an unknown officer" to take plaintiff out of his cell and place him in an "Interview Room," where defendant Sears, Bisso, and the unknown officer beat plaintiff again by pushing his face into the wall and hitting

---

[5] The sergeant was apparently defendant Bisso. Plaintiff does not mention the name of the sergeant until he is describing the May 16th incident. (Compl. at 12).

[6] Plaintiff may be trying to say that the nurse reported this incident to "a lieutenant."

him in the rib cage. (*Id.*)  Defendant Bisso allegedly told the other officers not to hit plaintiff in the face because they would be taking pictures in the clinic. (*Id.*)

Plaintiff was then escorted to the clinic, where he reported his injuries, but was afraid to tell Nurse Bob Fitzgerald what "really happened" because the defendants were in the examining room, and defendant Bisso told plaintiff that "we break bones you better not tell on us."[7] (*Id.* at 13).

## B.    Second Incident

Plaintiff alleges that on November 5, 2011, he was in a Clinton "hospital Dry Cell" for inserting a tub of cream up his rectum. (Compl. at 14).  Plaintiff claims he was also having thoughts of hurting himself.  Plaintiff states that he recognized defendant Bisso "and became fearful."  A mental health medication nurse came to take plaintiff's vital signs, but plaintiff grabbed the thermometer and tried to swallow it.[8] (*Id.*)  Plaintiff then started to stab himself in the arm with the same thermometer. (*Id.* at 14-15).  Plaintiff states that officers opened the cell door, took the thermometer away from plaintiff and applied handcuffs. (*Id.* at 15).

However, plaintiff claims that, as defendant Russell was applying the handcuffs, he "started bending [plaintiff's] ankles in a [breaking] position causing pain."  Then another officer bent plaintiff's legs toward his back, also in a "breaking" position,

---

[7] Plaintiff states that "some days later," he reported his injuries to a different male nurse (Mr. Ericson), who plaintiff saw on a "sick call visit." (Compl. at 13).

[8] The date of the incident is unclear because plaintiff states that he was in OBS on November 5, 2011, but the mental health nurse came to take plaintiff's vital signs "[o]n that same day or the next day Nov 5, 2011." (Compl. at 14).  If he was in OBS on November 5, "the next day" would have been November 6.  However, the discrepancy is irrelevant for purposes of this recommendation.

during which plaintiff screamed in pain and begged the officers to stop hurting him. (*Id.*) Plaintiff claims that at least one near-by inmate could see what was happening. Plaintiff was then "dragged" off the hospital floor down to the emergency room clinic. (*Id.*)

Plaintiff claims that defendant Bisso ordered an officer to take plaintiff out of the cell, and when plaintiff complained that he could not walk, defendant Bisso said: "When they get through with you[,] you won't be able to walk . . . ." (*Id.* at 16). Defendants Barnes and Tuller "took control" of plaintiff and took him to the Emergency Room Clinic, where they met defendant Sergeant Durkin, who plaintiff alleges "took part in the torturing." (*Id.*) Plaintiff alleges that he was tortured with what felt like a steel hand cuff that defendants Barnes and Tuller drove into plaintiff's ankle, causing him "excruciating pain." (*Id.*) Plaintiff claims that defendant Durkin laughed and held smelling salts up to plaintiff's nose while they were torturing him so that he would not faint from the pain, while telling plaintiff that they could "do this all day." (*Id.* at 17). Plaintiff claims that defendant Durkin "ordered" defendants Barnes and Tuller to "continuously drive the steel cuff into [plaintiff's] ankle as he screamed out in pain." (*Id.*)

Plaintiff claims that this conduct "went on for some time," until defendant Durkin told the officers to force plaintiff to stand. (*Id.*) When plaintiff could not do so, one of the officers twisted both of plaintiff's wrists at the same time so that he would stand for the pictures. (*Id.* at 18). Plaintiff states that by this time, he could barely breathe, and his lungs felt as if they were going to collapse. (*Id.*) Plaintiff claims that

Nurse Bob Fitzgerald[9] could see some of the torture because he was right outside the room, and he came into the room "at some point" before the defendants finished torturing plaintiff. (*Id.*) Plaintiff claims that Nurse Fitzgerald finally told the defendants to allow plaintiff to lay down on the examination table, hooked plaintiff up to a heart monitor, and called an outside hospital. (*Id.*)

## C.    Third Incident

Plaintiff states that on November 7, 2011, he was still in the OBS cell, where he had been placed after "losing control[]" on November 5, 2011. (*Id.* at 19). Plaintiff alleges that defendant Plumbly asked plaintiff to put his hands out of the feed up hatch, but plaintiff was afraid to do so because he feared for his life and feared that he would be beaten again. (*Id.*) Based on this fear, plaintiff asked defendant Plumbly "why." Defendant Plumbly became hostile and angry, slammed the hatch down and went to get defendant Sears. (*Id.*)

Defendants Plumbly and Sears then entered plaintiff's cell and began to beat him in the head, slap him across the face, choke him, and hit him on the right side of his lower back. (*Id.* at 20). Plaintiff claims that defendant Plumbly told plaintiff that he would beat him within an inch of his life, and that plaintiff could "tell who you want, my word is like Gold around here." (*Id.*) Plaintiff claims that defendant Plumbly also called plaintiff a vulgar name.

Plaintiff alleges that he was "unable to file [a] Grievance" because he feared for his life. In addition to being called vulgar names, plaintiff claims that he has been

---

[9] Nurse Fitzgerald has not been named as a defendant.

discriminated against, harassed, assaulted, and drugs have been placed in his food and water. (*Id.*) Plaintiff appears to speculate that this alleged harassment by staff has resulted as the aftermath of an un-described incident that occurred at Green Haven in 2004. Plaintiff claims that after this "incident," he was told that, if he told the Superintendent what "they" did to him, "they" would haunt him every where he went. (*Id.* at 21). Plaintiff states that ever since the "incident" at Green Haven in 2004, he has been "haunted from prison to prison," harassed, assaulted, and his life has been threatened several times, causing mental and emotional injury. (*Id.*) Plaintiff then states that "the court understands why he was unable to griev. the first and third incidents . . . He was also in and out of the OBS Mental Health Unit in every prison he has been in . . . ." (*Id.*)

Plaintiff has listed seven "causes of action." (Compl. at 22-24). The first cause of action is against defendant Durkin for his involvement in the Eighth and Fourteenth Amendment violations. (*Id.* at 22). The second cause of action is against defendant Bisso (*Id.*); the third and fourth causes of action are against defendant Russell (*Id.* at 22-23); the fifth cause of action is against defendants Barnes and Tuller, for their "malicious" assault and torture (*Id.* at 23); the sixth cause of action is against defendants Plumbly, Bisso, and Sears (*Id.* at 24); and the seventh cause of action is against defendants Plumbly and Sears. (*Id.*)

## II. <u>Motion to Dismiss</u>

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp.*, 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir. 1995). The court must heed its particular obligation to treat pro se pleadings with liberality. *Phillips v. Girdich*, 408 F.3d 124, 128 (2d Cir. 2005); *Tapia Ortiz v. Doe*, 171 F.3d 150, 152 (2d Cir. 1999) (*per curiam*).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment). Finally, the court may consider matters of which judicial notice may be taken, such as public filings and administrative decisions. *See Kavowras v. New York*

*Times, Co.*, 328 F.3d 50, 57 (2d Cir. 2003) (citing *inter alia County Vanlines, Inc. v. Experian Info. Solutions, Inc.*, 205 F.R.D. 148, 154 (S.D.N.Y. 2002) (taking judicial notice of NLRB decisions)). *See also Combier Kapel v. Biegelson*, 242 F. App'x 714, 715 (2d Cir. 2007) (taking judicial notice of the Impartial Hearing Officer's decision as well as certain other documents in the administrative record of an IDEA case); *In re Howard's Exp., Inc.*, 151 F. App'x 46, 48 (2d Cir. 2005) (taking judicial notice of Bankruptcy Court docket); *Caro v. Fidelity Brokerage Services, LLC*, No. 3:12-CV-1066, 2013 WL 3299708, at *6 (D. Conn. July 26, 2013) (taking judicial notice of record in prior litigation between the same parties).

## III.  Exhaustion of Administrative Remedies

### A.  Legal Standards

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. §1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action.  This requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim.  *See Giano v. Goord*, 380 F.3d 670, 675–76 (2d Cir. 2004) (citing *Porter v. Nussle,* 534 U.S. 516, 532 (2002) (exhaustion requirement applies, *inter alia*, to excessive force claims)).  Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings.  *Id.* at 675.  The failure to exhaust is an affirmative defense that must be raised by the defendants.  *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004).  As an affirmative defense, it is the

9

defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state procedural rules, including meeting appropriate deadlines. *Jones v. Bock*, 549 U.S. at 218–19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion is a prerequisite to bringing suit in federal court. 548 U.S. at 90–103. In *Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516 (2002), the Second Circuit specifically held that completion of the administrative review process includes receiving the decision on the final appeal of a grievance ***prior to*** filing the federal action.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id*. § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id*. § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a

grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

At the same time that the Second Circuit decided *Giano*, it also decided four other related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement, and specifying various instances in which the requirement could be waived or excused.[10]  Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement.  *See Brownell v. Krom*, 446 F.3d 305, 311–12 (2d Cir. 2006) (citing *Hemphill*, 380 F.3d at 686).  The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

Although the Second Circuit has not explicitly held that *Hemphill* remains good law after *Woodford*, it has noted in more recent cases, that the exhaustion requirement may be excused, as have other district courts.[11]  *See, e.g., Macias v. Zenk*, 495 F.3d 37

---

[10] *See Hemphill v. State of New York*, 380 F.3d 680 (2d Cir. 2004) (remanding case to determine if defendant's alleged threats constituted "special  circumstances" justifying plaintiff's failure to exhaust); *Abney v. McGinnis*, 380 F.3d 663 (2d Cir. 2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman*, 380 F.3d 691 (2d Cir. 2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride*, 380 F.3d 649 (2d Cir. 2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

[11] This court also notes that, based upon the concurring opinion in *Woodford*, it appears that the Second Circuit decisions have *not* been overruled in that respect.  In his concurring opinion in *Woodford*, Justice Breyer specifically noted that two circuits, the *Second* Circuit and the Third Circuit that have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts [in *Woodford*] have concluded that the PLRA's proper exhaustion requirement is not absolute." *Woodford*, 548 U.S. at 104 (citing *Spruill v. Gillis*, 372 F.3d 218, 232 (3d Cir. 2004); *Giano v. Goord*, 380 F.3d 670, 677 (2d Cir. 2004)) (Breyer, J. concurring).  Justice Breyer then stated that on remand,

(2d Cir. 2007) (using the three-part inquiry); *Davis v. State of New York*, 311 F. App'x 397, 399 (2d Cir. 2009) (recognizing that there may be exceptions to the exhaustion requirement); *Snyder v. Whittier*, 428 F. App'x 89, 91 (2d Cir. 2011) (using the three-part inquiry); *Carlson v. Parry*, No. 06-CV-6621, 2013 WL 5354517, at *9-10 (W.D.N.Y. Sept. 24, 2013) (recognizing that the exhaustion requirement may be excused); *Morrison v. Hartman*, 898 F. Supp. 2d 577, 581 (W.D.N.Y. 2012) (same).

## B.    Application

In this case defendants argue that plaintiff admits that he failed to exhaust his administrative remedies with respect to the first and third incident. (Def.s' Mem. of Law at 5-10). They also argue that plaintiff has failed to allege that the remedies were "unavailable," that he was prevented from exhausting, or that "special circumstances" existed which would excuse his failure to exhaust. (*Id.*) This court cannot agree that plaintiff's alleged failure to exhaust is clear. Plaintiff states that "the court understands why he was unable to griev. [sic] the first and third incidents." (Compl. at 21). While this statement appears to concede that he did not exhaust his administrative remedies with respect to the first and third incidents, on the same page, he appears to claim that he was threatened and mentally ill.

The court also notes that on the third page of the complaint, plaintiff answered "yes" to the question of whether he presented the facts relating to his complaint in grievance program. (Compl. at 3). He states that "the Grievance process was **completed**

---

the lower court should "similarly" consider any claims that the inmate might have concerning whether his case "falls into a *traditional exception that the statute implicitly incorporates*." *Id.* (emphasis added). This statement implies that there are still exceptions that a court may consider.

on [sic] Second and Third Incidents," but that "not all of the facts" were presented relative to the first incident. (*Id.*) (emphasis added). Thus, it is unclear whether the statement cited by defendants is a concession by plaintiff that he failed to exhaust. Defendant argues that a motion to dismiss pursuant to Rule 12(b)(6) is appropriate when the failure to exhaust is "apparent from the face of the complaint." (Def.s' Mem. of Law at 8) (citing *McCoy v. Goord*, 255 F. Supp. 2d 233, 249 (S.D.N.Y. 2003)). However, based on the inconsistency in plaintiff's complaint, and the following discussion regarding whether exhaustion should be excused even if he did fail to exhaust, this court cannot find that a motion to dismiss is appropriate.

Defendants argue that "[c]onspicuously absent" from the complaint is any claim that he is exempt from exhaustion for any of the "enumerated" reasons in *Hemphill*. (Def.s' Mem. of Law at 9). The failure of an inmate to file an internal grievance may be excused where the inmate establishes that he was threatened, and that the threat was "sufficient to render grievance procedures unavailable." *Snyder v. Whittier*, 428 F. App'x at 91. Whether a threat was sufficient to render grievance procedures unavailable involves an objective inquiry as to whether "a similarly situated individual of ordinary firmness would have deemed [the procedure] [un]available." *Carlson v. Parry*, No. 06-CV-6621, 2013 WL 5354517, at *9-10 (W.D.N.Y. Sept. 24, 2013) (quoting *Hemphill v. New York*, 380 F.3d at 688) (alterations in original).

A generalized fear for the inmate's personal safety or fear of retaliation is insufficient to render the grievance procedures unavailable. *See Brown v. Napoli*, 687 F. Supp. 2d 295, 297 (W.D.N.Y. 2009). This "generalized fear" is insufficient because

"[i]f every plaintiff bringing a retaliation claim could have the exhaustion requirement excused by alleging a fear of further retaliation, it would create a general exception to exhaustion for retaliation claims." *Harrison v. Stallone*, No. 9:06-CV-902, 2007 WL 2789473, *6 (N.D.N.Y. 2007). In order to render the grievance procedure "unavailable," the fear of retaliation must be "reasonable." *Id.* (citing *Thomas v. Casseleberry*, No. 03-CV-6394, 2007 U.S. Dist. LEXIS 30129, at *3-6 (W.D.N.Y. Apr. 24, 2007). In *Thomas*, the court found that plaintiff's allegations concerning wide-spread beatings at Southport Correctional Facility and his claim that he was "personally" threatened by defendants if he did not "drop it," were sufficient to create a "reasonable fear of retaliation," rendering the grievance procedure unavailable to plaintiff and excusing his failure to exhaust. *Id.* at *3.

In this case, plaintiff alleges more than a generalized fear of retaliation. In connection with the first incident, plaintiff alleges that he was told "we break bones you better not tell on us." (Compl. at 13). Plaintiff states that defendant Plumbly told him that he would be beaten within an inch of his life, and that plaintiff could tell who he wanted, because Plumbly's word was "like Gold around here." (Compl. at 20). In the next paragraph, plaintiff states that he was unable to file a grievance "for fear of his life." (*Id.*) Plaintiff claims that his life has been threatened several times, and that the court "can understand why he was unable to" file a grievance with respect to the first and third incidents.[12]

---

[12] The court also understands that plaintiff's statements are inconsistent and that if he truly feared for his life, he would not have exhausted his claims regarding any of the incidents. However, this is a motion to dismiss, and the court must accept the statements plaintiff makes as true. Questions

14

Finally, plaintiff appears to allege that his mental health status has kept him from properly exhausting his administrative remedies. Plaintiff's actual mental health diagnoses are not clear. Courts have declined to use a plaintiff's physical or mental condition to excuse the exhaustion requirement unless his condition made him "physically or mentally unable to comply with the grievance process." *See Johnson v. New York City Dep't of Correct.*, No. 13 Civ. 6799, 2014 WL 2800753, at *6 (S.D.N.Y. June 16, 2014) (granting a motion to dismiss for failure to exhaust by schizophrenic inmate) (quoting *Bennett v. James*, 737 F. Supp. 2d 219, 227-28 (S.D.N.Y. 2010), *aff'd*, 441 F. App'x 816 (2d Cir. 2011)). In *Johnson*, the court declined to find that plaintiff's mental condition excused his failure to exhaust because the plaintiff did not allege that his schizophrenia interfered with his ability to utilize the grievance process, and there were no facts in the record, indicating that his mental condition rendered him unable to file a grievance during the relevant time. *Id.*

The court must keep in mind that the burden of showing that plaintiff did not exhaust his remedies lies with defendants. *Key v. Toussaint, supra.* In this case, plaintiff has at least attempted to allege that his mental condition prevented him from filing his grievances. Whether that allegation is meritorious cannot be determined solely by reviewing the complaint. The court notes that plaintiff's two attempts at responding to the defendants' motion to dismiss raise some questions as to his ability to express himself. (Dkt. Nos. 36, 36). Thus, this court will not recommend dismissal for

---

regarding the facts may be determined on a subsequent dispositive motion after some discovery has taken place.

failure to exhaust administrative remedies at this time. The court does not preclude a later finding that plaintiff did not exhaust, after some discovery, and a properly supported summary judgment motion.

## IV. **Excessive Force**

Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian*, 503 U.S. 1, 9–10 (1992). The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976); *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be "'inconsistent with the contemporary standards of decency.'" *Whitely v. Albers*, 475 U.S. 312, 327 (1986) (citation omitted); *Hudson*, 503 U.S. at 9. "[T]he malicious use of force to cause harm constitute[s][an] Eighth Amendment violation per se[,]" regardless of the seriousness of the injuries. *Blyden*, 186 F.3d at 263 (citing *Hudson*, 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition de minimis uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9–10 (citations omitted). "'Not every push or shove, even if it may later seem unnecessary in the peace

16

of a judge's chambers, violates a prisoner's constitutional rights.'" *Sims*, 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id*. at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Id*. (quoting *Hudson*, 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response." *Scott v. Coughlin*, 344 F.3d 282, 291 (2d Cir. 2003).

## B. Application

Defendants' motion to dismiss addresses only the merits of the claims arising from the "second" incident, based on the defense argument that plaintiff failed to exhaust the claims relating to the first and third incidents. Thus, this court will only address the second incident and will find that plaintiff's claims regarding the first and third incidents may go forward at this time. Defendants argue that plaintiff does not meet either the objective or the subjective prong of the Eighth Amendment analysis. (Def.s' Mem. of Law at 12-16).

There are two parts to the second incident. Plaintiff concedes that he "lost

control" on November 5, 2011. Admittedly, he grabbed a thermometer and tried to swallow it, and then subsequently started to stab himself in the arm. (Compl. at 14). It is clear that such conduct could require the guards to subdue plaintiff and place handcuffs on him to prevent any further injury to himself. Plaintiff alleges that defendants Russell and Hamelin entered his cell, pinned him down and applied handcuffs. (Compl. at 15). Plaintiff claims that the officers then bent plaintiff's ankles and legs into a "breaking" position, while plaintiff was screaming out in pain, begging them to stop hurting him. (*Id.*) Sergeant Bisso allegedly ordered defendants Russell and Hamelin to take plaintiff out of the cell, and as plaintiff was screaming in pain because he could not walk, told plaintiff that when "they get through with you[,] you won't be able to walk." (*Id.* at 16). Plaintiff was then "dragged" off the second floor, down to the emergency room clinic. (*Id.* at 15)

Defendants cite cases, holding that de minimis force, together with a lack of injury do not rise to the level of an Eighth Amendment violation. However, although handcuffs must be reasonably tight to be effective, and lack of a continuing injury beyond temporary discomfort is fatal to an Eighth Amendment claim, it is also true that overly tight handcuffing can constitute excessive force. *Milo v. City of New York*, No. 14-CV-1172, 2014 WL 5933091, at *6 (E.D.N.Y. Nov. 14, 2014) (citing *Lemmo v. McCoy*, No. 08-CV-4264, 2011 WL 843974, at *5 (E.D.N.Y. 2011); *Lynch ex rel. Lynch v. City of Mt. Vernon*, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008)). In *Lynch*, the court stated that in evaluating the reasonableness of handcuffing, the court must consider whether the handcuffs were unreasonably tight, whether the defendants

ignored the plaintiff's statements that the handcuffs were too tight, and the degree of injury to the wrists. *Lynch*, 567 F. Supp. 2d at 468 (multiple citations omitted).

In this case, plaintiff claims more than just tight handcuffing. He alleges that while placing the handcuffs on plaintiff, the defendants were bending his ankles and his legs back to the point where he claimed that he could not walk to the emergency room as a result.[13] Plaintiff claims that when he told defendant Bisso that he could not walk, defendant Bisso made a threatening comment. Plaintiff then claims that he was dragged off of the second floor. The court in *Lynch* was considering a motion for summary judgment and would have been able to analyze the required factors after the parties had engaged in some discovery regarding the incident. While it is possible that this plaintiff may not succeed on a motion for summary judgment, based on either a lack of continuing injury, or on a de minimis use of force, plaintiff's allegations appear to be sufficient to withstand a motion to dismiss.

The second part of the incident involves defendants Barnes, Tuller, and Durkin. Plaintiff claims that these defendants "took control" of plaintiff when he got to the emergency room. Plaintiff alleges that defendant Durkin took part in "torturing" plaintiff. (Compl. at 16). Plaintiff claims that defendants Barnes and Tuller drove something that felt like a steel cuff into plaintiff's ankle, and then held smelling salt up to his nose so that he would not faint from the pain, while telling him that they could "do this all day." (*Id.* at 16-17) Although defendants claim that plaintiff has not alleged

---

[13] Plaintiff refers to this as a "breaking position." This term is not clear to the court, and plaintiff may be having trouble expressing himself. This would be another reason to allow some discovery regarding the incidents that plaintiff describes.

"malicious intent," plaintiff's description of the entire incident, beginning with the word "torture," and ending with the allegation that the defendants implied that they could make the pain last all day is certainly indicative of malicious intent. Plaintiff claims that this conduct, which does not appear to be related to any reasonable basis, "went on for some time." (*Id.* at 17).

Plaintiff also alleges that defendant Durkin ordered plaintiff to stand for the photographs to be taken, and when he could not stand, the other officers twisted plaintiff's wrists in order to force him to stand. (*Id.* at 17-18). Plaintiff also appears to claim that by the time he was forced to stand, the smelling salts made his lungs feel like they were going to collapse. (*Id.*) While the court does find that there are inconsistencies in plaintiff's complaint, and as stated above, his allegations may not withstand a motion for summary judgment, plaintiff has made sufficient allegations to withstand a motion to dismiss.

## V.   Fourteenth Amendment

### A.   Legal Standards

Under the appropriate circumstances, a plaintiff may base an excessive force claim on the Fourth, Eighth, or Fourteenth Amendments. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The court specifically found that the two primary sources of a plaintiff's rights are the Fourth Amendment (unreasonable seizure of a free citizen) and the Eighth Amendment (cruel and unusual punishment applied to convicted prisoners). *Id.* at 394-95. Claims of excessive force against pre-trial detainees have been analyzed under the Fourteenth Amendment. *Richardson v. Providence*, No. 09-CV-4647, 2011

WL 3701887, at *6 (E.D.N.Y. Aug. 22, 2011) (citation omitted).

### B.    Application

Defendants argue that to the extent that plaintiff bases this action on substantive due process under the Fourteenth Amendment, it must be dismissed. (Def.s' Mem. of Law at 16-17).  Plaintiff in this case is a convicted inmate, and thus, his allegations of excessive force arise under the Eighth Amendment.  To the extent that the plaintiff makes claims of Fourteenth Amendment violations, these may be dismissed.[14]

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED**, that defendants' motion to dismiss (Dkt. No. 30) be **GRANTED** only to the extent that plaintiff bases his claims on the Fourteenth Amendment, and it is

**RECOMMENDED**, that the defendants' motion to dismiss (Dkt. No. 30) be **DENIED IN ALL OTHER RESPECTS**, and it is

**ORDERED**, that plaintiff's motion for an extension of time to respond to the defendants' motion (Dkt. No. 38) is **DENIED AS MOOT.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary*

---

[14] The court notes that the standard for excessive force used in either analysis is the same. *Richardson v. Providence*, 2011 WL 3701887, at *6 n.2 (citations omitted).

*of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: December 8, 2014

Hon. Andrew T. Baxter
U.S. Magistrate Judge